UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

CAMELOT BANQUET ROOMS, INC.,

    Plaintiff,

  v.        Case No. 25-CV-703

MESA UNDERWRITERS SPECIALTY
INS. CO.,

    Defendant.

## ORDER

**1. Procedural History**

On April 10, 2025, plaintiff Camelot Banquet Rooms, Inc. ("Camelot") filed a complaint in Milwaukee County Circuit Court against defendant Mesa Underwriters Specialty Insurance Company ("MUSIC"). Camelot asserts the following claims: negligent inspection; breach of contract; and bad faith. (ECF No. 2-1, ¶¶ 32-58.)

On May 14, 2025, MUSIC removed the action to this court based on diversity jurisdiction pursuant to 28 U.S.C. § 1441(b). (ECF No. 1.) MUSIC states that Camelot is a corporation incorporated in and with its principal place of business in Wisconsin, and MUSIC is a corporation incorporated in and with its principal place of business in New

Jersey. (ECF No. 1 at 4.) Therefore, complete diversity of citizenship exists. Camelot demands up to $30,000 in damages for its breach of contract claim (ECF No. 2-1, ¶ 42), alleges it "has suffered damages in an amount to be determined at trial" for its negligent inspection claim (*id.*, ¶ 40), and seeks punitive damages under its bad faith claim (*id.*, ¶ 58). Because it is possible Camelot could recover more than $75,000 with a punitive damages award, the amount in controversy requirement is satisfied. *See Jump v. Schaeffer & Assocs. Ins. Brokerage, Inc.*, 123 Fed. App'x 717, 720 (7th Cir. 2005) ("[If] punitive damages are recoverable as a matter of state law … subject matter exists unless it is clear beyond a legal certainty that the plaintiff under no circumstances would be entitled to recover an amount sufficient to satisfy the jurisdictional amount."). Consequently, this court has jurisdiction under 28 U.S.C. § 1332(a).

On May 19, 2025, MUSIC filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). (ECF No. 6.) The motion is fully briefed and ready for resolution. (ECF Nos. 7, 11, 13.) All parties have consented to the jurisdiction of this court. (ECF Nos. 5, 9.)

**2. Facts**

The court accepts Camelot's well-pled allegations as true for purposes of deciding a motion to dismiss and draws all reasonable inferences in Camelot's favor. *See Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). The court also considers the insurance policy (ECF No. 8-1), a "document[] … critical to the complaint and referred

to in it." *Concepts Design Furniture, Inc. v. Fisherbroyles, LLP*, No. 22-2303, 2023 WL 2728816, at *1 (7th Cir. Mar. 31, 2023) (quoting *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012)); *see also Murray v. Loewen Grp.*, 133 F. Supp. 2d 1110, 1116 n.6 (E.D. Wis. 2001) ("Because [Plaintiff] referred to the insurance policy in the complaint, and the insurance policy is central to [Plaintiff]'s claims against [Defendant Insurance Company], the court may properly consider the insurance policy on the motion to dismiss.").

Camelot had a commercial property insurance policy with MUSIC that covered Camelot's building and certain personal property. (ECF No. 2-1, ¶ 3.) Around the time MUSIC issued the policy to Camelot, and each year thereafter, MUSIC inspected Camelot's building. (*Id.*, ¶ 7.) Based on the inspections, MUSIC recommended and demanded changes to the building, such as fixing overgrown trees, shrubs, weeds, and vegetation "to avoid notice of cancellation or non-renewal being issued." (*Id.*, ¶ 10.) Camelot states that it "relied on [MUSIC] to inform [it] of any issues with the Building following [MUSIC]'s inspections." (*Id.*, ¶ 11.)

The policy laid out the following on inspections:

1. We have the right to:

    a. Make inspections and surveys at any time;

    b. Give you reports on the conditions we find; and

    c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

(ECF No. 8-1 at 7.)

In August 2023, while a general contractor was performing work on its building, Camelot discovered water damage below the floor and behind sections of interior trim and drywall. (ECF No. 2-1, ¶ 12.) Camelot determined the damage was likely caused by damaged rubber membranes around scuppers on the west wall of the building and failing roof flashing. (*Id.*, ¶ 13.) Camelot states that "[t]hese conditions were visible and could and should have been caught by [MUSIC]'s inspector(s)." (*Id.*)

MUSIC's inspectors never noted the issues with the scuppers or roof flashing, nor instructed Camelot to repair them. (ECF No. 2-1, ¶ 14.) Camelot relied on MUSIC's inspectors in deciding not to hire an independent inspector to inspect the scuppers or roof flashing. (*Id.*, ¶ 17.) Camelot incurred "substantial damages" to restore the water-damaged property. (*Id.*, ¶ 19.)

MUSIC denied Camelot's insurance claim for the water damage. (ECF No. 2-1, ¶ 20.) The policy includes the following relevant exclusions and inclusions:

- "We will not pay for loss or damage caused by or resulting from … [c]ontinuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more." (ECF No. 8-1 at 54.)

- "We will pay for loss or damage by 'fungus', wet or dry rot or bacteria" resulting from "a 'specified cause of loss' other than fire or lightning[,]" "limited to $15,000" in damages—an additional coverage Camelot purchased. (ECF No. 2-1, ¶ 21; ECF No. 8-1 at 59.)

- "'Specified causes of loss' means the following: fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire-extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage." (ECF No. 8-1 at 61.)

- "Water damage" means:

    **(1)** Accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of a plumbing, heating, air conditioning or other system or appliance (other than a sump system including its related equipment and parts), that is located on the described premises and contains water or steam; and

    **(2)** Accidental discharge or leakage of water or waterborne material as the direct result of the breaking apart or cracking of a water or sewer pipe that is located off the described premises and is part of a municipal potable water supply system or municipal sanitary sewer system, if the breakage or cracking is caused by wear and tear.

(ECF No. 8-1 at 61.)

Camelot spent over $30,000 to restore the building from the water damage and contends that MUSIC should have paid Camelot the full $15,000 available under the

additional coverage for fungus, rot, and bacteria, for each occurrence, for a total of $30,000. (ECF No. 2-1, ¶ 30.)

**3. Motion to Dismiss Standard**

To survive a motion to dismiss under Rule 12(b)(6), "a [petition] must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face[.]'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A claim satisfies this pleading standard when its factual allegations "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555-56. The court accepts "all well-pleaded facts as true and constru[es] all inferences in favor of the plaintiff[]." *Gruber v. Creditors' Prot. Serv.*, 742 F.3d 271, 274 (7th Cir. 2014).

**4. Analysis**

**4.1. Negligent Inspection**

Camelot alleges that, by undertaking inspections of Camelot's building, MUSIC owed Camelot a duty to exercise reasonable care in performing such inspections, and it was negligent in failing to adequately perform inspections and identify the issues with the scuppers and flashing of the building. (ECF No. 2-1, ¶¶ 32-40.)

### 4.1.1. Applicability of Wis. Stat. § 895.475

MUSIC argues that Wisconsin Statute § 895.475 precludes this claim. The statute provides:

> The furnishing of, or failure to furnish, safety inspection or advisory services intended to reduce the likelihood of injury, death or loss shall not subject … an insurer, the insurer's agent or employee undertaking to perform such services as an incident to insurance, to liability for damages from injury, death or loss occurring as a result of any act or omission in the course of the safety inspection or advisory services.

Wis. Stat. § 895.475. The statutory provision does not apply when the insurer created the condition that caused the loss or when the inspection or advisory services are required under a written contract—exceptions inapplicable here. *Id.*

"The statutory language and case law make clear that this exemption from civil liability applies when an insurer voluntarily inspects an insured's property to ensure that it is safe and up-to-code …." *Cincinnati Ins. Co. v. Ropicky*, 959 N.W.2d 356, 362 (Wis. Ct. App. 2021) (explaining that the statute applies to advisory services to reduce the likelihood of loss, not post-loss claims investigations).

Camelot relies on *American Mutual Liability Ins. Co. v. St. Paul Fire & Marine Ins. Co.*, 179 N.W.2d 864 (Wis. 1970), to argue that Wis. Stat. § 895.475 does not bar its negligent inspection claim. (ECF No. 11 at 3-5.) It argues that, as stated in *American Mutual*, the statute does not limit the general application of Section 324A of the Second Restatement of Torts. (ECF No. 11 at 3); *see also* Restatement (Second) if Torts § 324A ("Liability to Third Person for Negligent Performance of Undertaking").

This argument is based on the following footnote in *American Mutual*:

> We note sec. 895.[475], Stats. (Laws of 1965, ch. 375, effective date November 23, 1965) purports to eliminate a cause of action such as asserted herein. The statute does not apply to the accident of May 15, 1965, nor does it purport to limit the general application of sec. 324A, Restatement ….

*Am. Mut. Liab. Ins. Co.*, 179 N.W.2d at 870.

As the court noted in *A.O. Smith Corp. v. Viking Corp.*:

> The case relied upon by the … plaintiff[] was decided before the effective date of s 895.[475], and thus the statute was not operative at the time of that decision. The court's footnote … indicates that s 895.[475] was enacted to eliminate a cause of action against an insurer for negligent inspection. The court's additional statement that the statute does not "purport to limit the general application of sec. 324 A, Restatement, (Torts 2d, p. 142)," does not mean that section 324 A of the Restatement would apply to an insurer under the circumstances of a negligent inspection but rather means that the rules of the Restatement would continue to apply generally to negligent performance of gratuitous acts. Any other reading of the court's comment would emasculate s 895.[475].

*A.O. Smith Corp. v. Viking Corp.*, 79 F.R.D. 91, 93-94 (E.D. Wis. 1978).

MUSIC voluntarily undertook inspections "relat[ed] only to insurability and the premiums to be charged" and "[did] not warrant that conditions … [were] safe or healthful[,] or … [c]ompl[ied] with laws, regulations, codes or standards." (ECF No. 8-1 at 7.) Camelot's negligent inspection claim attempts to bring a civil claim against MUSIC for its failure to identify and advise on the damaged scuppers and roof flashing in the course of its advisory service. This claim falls directly within Wis. Stat. § 895.475. Accordingly, MUSIC may not be subject to liability for damages from the loss.

#### 4.1.2. Constitutionality of Wis. Stat. § 895.475

Camelot argues that, if Wis. Stat. § 895.475 does apply, it is unconstitutional. (ECF No. 11 at 5-11.) It argues that the statute violates its right to its day in court under the Wisconsin Constitution, art. I, § 9, and to a trial by jury under the U.S. Constitution, amend. VII. (*Id.*)

The Wisconsin Supreme Court has made clear that "art. I, § 9 confers no legal rights." *Aicher ex rel. LaBarge v. Wis. Patients Comp. Fund*, 613 N.W.2d 849, 863 (Wis. 2000). "Rather, art. I, § 9 applies only when a prospective litigant seeks a remedy for an already existing right." *Id.* "The right-to-remedy clause thus preserves the right 'to obtain justice on the basis of the law as it in fact exists.'" *Id.* (quoting *Mulder v. Acme–Cleveland Corp.*, 290 N.W.2d 276, 284 (Wis. 1980)).

Article I, section 9 does *not*, however, "empower this court to substitute its views for legislative policy." *Aicher ex rel. LaBarge*, 613 N.W.2d at 865. The legislature has the authority "to define and limit causes of action and to abrogate common law on policy grounds." *Id.* at 864. The Wisconsin Constitution explicitly recognizes this legislative authority in article XIV, section 13. *Id.* at 862 n.12. Accordingly, the Wisconsin Supreme Court found in *LaBarge* that a statute of limitations, limiting recovery in medical malpractice actions, was constitutional even though the common law allowed such claims.

"We cannot preserve a right to obtain justice where none in fact exists. Were we to extend a right to remedy outside the limits of these recognized rights, we effectively would eviscerate the ability of the legislature" to define and limit actions. *Aicher ex rel. LaBarge*, 613 N.W.2d at 865 (citation omitted). Accordingly, Wis. Stat. § 895.475 does not run afoul of article I, section 9 of the Wisconsin Constitution.

Nor does it run afoul of the right to trial by jury under the Seventh Amendment of the U.S. Constitution. First, this right is not incorporated against the states and does not apply to the action of the state legislature. *McDonald v. City of Chicago*, 561 U.S. 742, 765 n.13 (2010); *Minneapolis & St. L.R. Co. v. Bomboli*, 241 U.S. 211, 217 (1916). Second, the Seventh Amendment guarantees only a right to a jury where the party has a right to a suit. *See Mountain Timber Co. v. Washington*, 243 U.S. 219 (1917). Camelot's argument "fails to recognize that Congress has the power to modify or abolish common law rights or remedies." *Stumo v. United Air Lines, Inc.*, 382 F.2d 790, 787 (7th Cir. 1967) (citation omitted).

Finding no merit in Camelot's argument that Wis. Stat. § 895.475 is unconstitutional, the court will dismiss Camelot's negligent inspection claim pursuant to Wis. Stat. § 895.475.

**4.2. Breach of Contract**

Camelot alleges that MUSIC breached its contract by refusing to pay up to $30,000 for water damage covered by the insurance policy. (ECF No. 2-1, ¶¶ 41-50.)

Camelot contends that the loss is covered by the "'fungus', wet or dry rot or bacteria" coverage and does not fall within the exclusion for "continuous or repeated seepage or leakage of water." (ECF No. 11 at 11-13.) It argues the exclusion does not apply because rainwater is not a 14-day seepage or exposure to moisture. (*Id.*)

MUSIC contends that the alleged damage—"leakage into the Building from the broken and/or cracked roof flashing and rubber membrane adhered to the scuppers occur[ing] over the course of several years"—was the result of "continuous or repeated seepage or leakage of water … over a period of 14 days or more." (ECF No. 7 at 10 (first quoting ECF No. 2-1, ¶ 31; then quoting ECF No. 8-1 at 59-60).) Accordingly, MUSIC argues the loss falls within the exclusion and is not covered by the policy.

Wisconsin substantive law applies to the interpretation of an insurance policy. Under Wisconsin law, insurance contracts are interpreted using the same principles applicable to contracts generally. *Kemper Indep. Ins. Co. v. Islami*, 959 N.W.2d 912, 917 (Wis. 2021). The court "give[s] undefined words and phrases their common and ordinary meaning" and construes the terms "as they would be understood by a reasonable person in the position of the insured[.]" *Leicht Transfer & Storage Co. v. Pallet Cent. Enters., Inc.*, 928 N.W.2d 534, 538 (Wis. 2019) (quoting *Day v. Allstate Indem. Co.*, 798 N.W.2d 199, 206 (Wis. 2011), and *Am. Fam. Mut. Ins. Co. v. Am. Girl, Inc.*, 673 N.W.2d 65, 73 (Wis. 2004)). In interpreting an insurance contract, the court looks first to whether there is an initial grant of coverage, then to whether an exclusion precludes coverage.

*See Am. Girl, Inc.*, 673 N.W.2d at 73 (describing the process by which courts examine insurance contracts).

The parties assume for purposes of the motion to dismiss that the policy creates an initial grant of coverage under the provision for "'fungus', wet rot, dry rot and bacteria." (ECF No. 7 at 12; ECF No. 11 at 11-12; ECF No. 8-1 at 59.)

Such fugus, rot, or bacteria must be the result of a "specified cause of loss," which the policy defines to include certain events (e.g., "fire; lightning; explosion"), including "water damage." (ECF No. 8-1 at 61.) "Water damage" is defined to include "[a]ccidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of a plumbing, heating, air conditioning or other system or appliance … that is located on the described premises and contains water or steam[.]" (*Id.*) The Court is not convinced that this language covers the water leakage here. *See Matthews v. Harleysville Ins. Co.*, 826 Fed. App'x 508, 515 (6th Cir. 2020) (finding "the water damage to the building [t]here [did] not qualify as a 'specified cause of loss'" under a similar provision "because a roof is plainly not a 'system or appliance.'").

But assuming as the parties do that the loss *does* qualify for coverage under the "'fungus', wet rot, dry rot and bacteria" provision, it is nonetheless excluded under the "[c]ontinuous or repeated seepage or leakage of water" provision. Camelot alleges "water leak[ed]" into the building due to "damaged rubber membranes around scuppers" and failing roof flashing, resulting in "water damage" "over the course of

several years." (ECF No. 2-1, ¶¶ 13, 18, 31.) This is precisely the type of damage one would expect to fall under an exclusion for "[c]ontinuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more." (ECF No. 8-1 at 54.) "Continuous or repeated seepage or leakage of water … over a period of 14 days or more" does not imply that such leakage must occur for a contiguous 14 days as Camelot suggests, but that such leakage is an ongoing issue.

Camelot cites two state of Washington district court cases concluding that rainwater cannot be characterized as a 14-day seepage or exposure to moisture. (ECF No. 11 at 12 (citing *Ridge at Riverview Homeowner's Ass'n v. Country Cas. Ins. Co.*, No. 21-CV-950, 2023 WL 22678, at *11 (W.D. Wash. Jan. 3, 2023), and *Eagle Harbour Condo. Ass'n v. Allstate Ins. Co.*, No. C15-5312, 2017 WL 1316936, at *4 (W.D. Wash. Apr. 10, 2017)).) These non-binding cases go against the commonsense interpretation of the policy, and, as MUSIC points out, are also against the weight of authority. (ECF No. 13 at 8-9.)

In a case from this district, the court found that similar language barred coverage for damage caused by water intrusion occurring over more than 14 days. *See Horizon W. Condo. Homes Ass'n, Inc. v. Travelers Indem. Co.*, 641 F. Supp. 3d 567, 577 n.3 (E.D. Wis. 2022) ("The policy contains a[n] … exclusion for damage caused by water that would apply here. … Although the complaint does not explicitly plead that the water intrusion occurred over a period of 14 days or more, that is the only reasonable inference that

13

Case 2:25-cv-00703-WED    Filed 07/01/25    Page 13 of 17    Document 14

could be drawn from the complaint's allegation that so much rust had formed as to make the building structurally unstable."). The Sixth Circuit Court of Appeals found the same. *See Iroquois on the Beach, Inc., v. General Star Indem. Co.*, 550 F.3d 585, 586-89 (6th Cir. 2008) (finding that, where water entered the building because of an insufficient steel frame, "occur[ing] gradually over the course of several years," "the seepage or leakage of water occurred for at least fourteen days, thus triggering the exclusion to prevent insurance coverage"); *see also Silver Ridge Homeowners' Ass'n, Inc. v. State Farm Fire & Cas. Co.*, 591 F. Supp. 3d 918, 935-36 (D. Or. 2022) (collecting cases where the "continuous or repeated seepage or leakage" "exclusion applie[d] in the context of water-related weather conditions, including rain").

Camelot argues such a finding goes against the words' ordinary meaning as it would be understood by the insured. (ECF No. 11 at 13-17.) It argues fungus and rot are necessarily caused by prolonged exposure to moisture, and thus an insured would believe that purchasing additional coverage for fungus, rot, and bacteria would cover "periodic exposure to … small amount[s] of water on multiple occasions over the course of many months." (*Id.* at 14.) Camelot further argues that allowing the exclusion to cover "the seepage of water over a period of time" would allow it to swallow the coverage for fungus, rot, and bacteria, making it illusory. (*Id.* at 14-15.)

Camelot's use of text identical to that of the exclusion in trying to describe how its loss is *not* included in the exclusion is indicative of the logical gymnastics it engages

14

in to argue its loss is not excluded under the policy. The "seepage … of water … over a period of [time]" is plainly *excluded* under the policy. (ECF No. 8-1 at 54.) This does not render the additional coverage for fungus, rot, and bacteria illusory—the policy covers repair for short-term water damage occurring from an isolated event (consistent with the policy's definition of "specified cause of loss"). As MUSIC points out, this "incentivize[s] insureds to remediate the effects of short-term water damage[,]" while limiting "coverage for long-term water damage which an insured might be tempted to let fester if covered under the policy." (ECF No. 13 at 12.)

The text of the policy unambiguously excludes protection from the type of leakage of water that occurred here.

Camelot further argues that, even if the exclusion applies, it is still entitled to coverage for the first 13 days of water leakage. (ECF No. 11 at 17-18.) It cites a Florida District Court of Appeals court which found similar policy language was ambiguous as to whether it covered a loss occurring during the first 13 days and thus found the ambiguous insurance provision must be read liberally in favor of the insured and the exclusionary clause read narrowly, resulting in coverage for the first 13 days of loss. *Hicks v. Am. Integrity Ins. Co.*, 241 So.3d 925, 927 (Fl. Dist. Ct. App. 2018).

A better reading of the provision considers what the "14 days" term modifies. The text of Camelot's insurance policy with MUSIC appears as follows:

> **2.** We will not pay for loss or damage caused by or resulting from any of the following:

> …
>
> **f.** Continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more.

(ECF No. 8-1 at 54.)

The structure of the exclusion here makes it unambiguous that the term "14 days" qualifies the length of time the seepage or leakage must persist to trigger the exclusion, *not* the scope of the "loss or damage" excluded.

As another court noted:

> [Plaintiff]'s position that the Policy provides coverage for loss caused by water during the first 13 days of a leak, even if that leak continues beyond 13 days, ignores that the temporal limitation imposed in the long-term leak exclusion applies to the peril—the continuous or repeated seepage or leakage of water—and not the loss. … [I]t is irrelevant whether [Plaintiff] sustained damages within any 13-day window because the long-term leak exclusion excludes peril such as that which occurred here, and once that peril occurred, the loss that flows from it … is excluded.

*McKain v. Safeco Ins. Co. of Am.*, 623 F. Supp. 3d 1117, 1122 (D. Mont. 2022).

Accordingly, all of Camelot's alleged damages fall outside the scope of coverage. The Court will dismiss Camelot's breach of contract claim.

**4.3. Bad Faith**

Having found that Camelot failed to state a breach of contract claim, it also fails to allege a bad faith claim. *Brethorst v. Allstate Prop. and Cas. Ins. Co.*, 798 N.W.2d 467, 470 (Wis. 2011) ("Some breach of contract is a fundamental prerequisite for a first-party bad

16
Case 2:25-cv-00703-WED     Filed 07/01/25     Page 16 of 17     Document 14

faith claim against an insurer."). Camelot does not argue otherwise. (ECF No. 11 at 18-19.)

Accordingly, Camelot's bad faith claim will be dismissed.

### 4.4. Leave to Amend

Camelot summarily requests the Court grant it leave to amend pursuant to Fed. R. Civ. P. 15(a)(2). (ECF No. 11 at 19.) Because there is nothing Camelot can do to overcome the shortcomings of its complaint—namely, being barred in part by Wis. Stat. § 895.475, and not being entitled to coverage under the insurance policy—any amendment would be futile. Thus, the Court will deny Camelot's request for leave to amend.

### 5. Conclusion

For the reasons set forth above,

**IT IS THEREFORE ORDERED** that the defendant's motion to dismiss (ECF No. 6) is GRANTED. Camelot's complaint is **dismissed with prejudice**. The Clerk shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that Camelot's request for leave to amend is **denied**.

Dated at Milwaukee, Wisconsin this 1st day of July, 2025.

_____
WILLIAM E. DUFFIN
U.S. Magistrate Judge